IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | No. 22-221 |
| | : | |
| EUDDY IZQUIERDO | : | |

## MEMORANDUM

**Judge Juan R. Sánchez**                                                                  **May 23, 2024**

Defendant Euddy Izquierdo moves to suppress evidence recovered from the search of a drug-involved premise he maintained at 2053 Sanger Street in Philadelphia, including drugs and firearms, and statements he made to Drug Enforcement Administration ("DEA") personnel. He argues the initial stop of his vehicle by law enforcement was unlawful, he was in custody during the stop, and he was coerced into giving (a) consent to searches of his vehicle and 2053 Sanger and (b) a statement. Because the stop was lawful, Izquierdo consented to the searches, and his statement was voluntary, the motion to suppress will be denied.

## FINDINGS OF FACT[1]

1. On April 16, 2021, Euddy Izquierdo delivered $50,000 to a DEA operative. On June 21, 2021, he delivered another $70,000 to a different DEA operative. As a result, DEA began investigating Izquierdo for money laundering and related drug crimes.[2]

---

[1] The following factual findings are based on the evidence presented at the suppression hearing on January 22, 2024, which included two signed consent to search forms, a signed waiver of rights form, photographic evidence, a DEA Report of Investigation, an Investigation Interview Record, and the testimony of DEA Task Force Officers Thomas Fahy and Joseph Fallon. The Court finds Officers Fahy and Fallon to be credible in all respects. Defendant Euddy Izquierdo also testified, but the Court does not find his testimony to be credible, as discussed in footnote 5.

[2] Izquierdo gave these sums to an undercover DEA agent and a DEA informant, but it is not clear which date/payment corresponds to the agent and which to the informant. Regardless, the parties agree DEA had probable cause to arrest Izquierdo for money laundering based on these payments.

2. In November 2021, DEA obtained court authorization to install a GPS tracker on Izquierdo's vehicle, a black BMW.

3. DEA used the GPS tracker to establish Izquierdo's "pattern of life." Tr. Suppress. Hr'g at 14:11, ECF No. 44. Izquierdo spent evenings and nights at his residence, an apartment located at 7701 Bustleton Avenue in Philadelphia. In the mornings, he went to a rowhome located at 2053 Sanger Street. Izquierdo spent his days driving back and forth between 2053 Sanger Street and the intersection of A Street and Indiana Avenue, a few miles away.

4. DEA Task Force Officer ("TFO") Thomas Fahy installed a pole camera with a view of the rear driveway and back door of 2053 Sanger Street. During the monthslong investigation, DEA never saw anyone else park a car in the driveway or use the rowhome's doors.

5. DEA also conducted physical surveillance at A and Indiana, which is a high drug crime area. TFO Fahy observed Izquierdo handing unidentified "stuff" through his car window and receiving "stuff" back. *Id*. at 18:6. TFO Fahy also observed the individuals whom Izquierdo met with selling drugs on the corner.

6. On January 8, 2022, Izquierdo drove to Cape May, New Jersey, and then to New Brunswick, where he spent most of the night at a bar. Izquierdo returned to 2053 Sanger Street early in the morning of January 9, 2022. He remained there until the next afternoon.

7. On January 10, 2022, TFOs Fahy and Joseph Fallon were outside the 2053 Sanger Street townhome when Izquierdo exited at 3:53 p.m. They watched him place a large trash bag in the back seat of his BMW. When Izquierdo left, they followed him as he turned right onto Torresdale Avenue, heading on "his usual route" towards A and Indiana. *Id*. at 23:8.

8. Based on the investigation, TFO Fahy believed 2053 Sanger Street was a "stash house" for drugs, or a "mill" to break down large quantities of drugs for street level distribution. *Id*.

2

at 22:14. He also believed the trash bag contained "mill garbage," or the trash from processing drugs, and that Izquierdo was disposing of the mill garbage outside of someone else's house. *Id*. at 23:15-21.

9. The TFOs asked a marked police vehicle to stop Izquierdo. At 3:58 p.m., two uniformed Philadelphia police officers used lights and sirens to pull Izquierdo over on Torresdale. The police officers walked up to the car, one on either side, and spoke to Izquierdo for three minutes. The officers then walked back to the TFOs' car and handed them Izquierdo's license. TFOs Fahy and Fallon went up to the BMW, returned Izquierdo's license, and introduced themselves as DEA personnel. TFO Fahy showed Izquierdo his badge and ID.

10. Izquierdo immediately said he didn't have drugs in the car. TFO Fahy asked Izquierdo to step out. Izquierdo complied, but continued to assert there were no drugs in the car.

11. TFO Fahy then asked for consent to search the BMW. Izquierdo verbally agreed. TFO Fahy followed up by asking Izquierdo if he read and understood English, and Izquierdo responded affirmatively. TFO Fahy gave Izquierdo DEA's standard consent to search form and asked him to read it. TFO Fahy also explained the form gave consent to search the vehicle.

12. The consent to search form lists the person, place or thing to be searched—in this case, Izquierdo's BMW—and includes the statements "I have not been threatened, nor forced in any way" and "I freely consent to this search" above a signature and witness lines. Gov't Ex. 1, ECF No. 46-1. Izquierdo took approximately one and a half to two minutes to review the form and did not ask any questions. He signed on the signature line. TFO Fallon and Fahy's names are handwritten below Izquierdo's signature on the witness lines. The form is dated January 10, 2022.

13. After Izquierdo gave his verbal and written consent, police searched the BMW. TFO Fahy and Izquierdo stood to the right and rear of the car, about three feet away. During the search, police found three cell phones and a coffee grinder box in the trash bag.[3]

14. After the search, Izquierdo volunteered information about a drug trafficking organization he was previously involved with.[4] TFO Fahy asked Izquierdo where he was coming from, and Izquierdo said Torresdale Avenue. TFO Fahy did not respond, and Izquierdo changed his answer to Bustleton Avenue. TFO Fahy then told Izquierdo they had been watching him and knew he was coming from 2053 Sanger Street, heading towards A and Indiana.

15. Like he had done in the past, Izquierdo immediately offered to cooperate with DEA. TFO Fahy asked Izquierdo for consent to search 2053 Sanger Street. Izquierdo agreed. He then said he had fentanyl, heroin, cocaine, methamphetamine, and a firearm at the rowhome.

16. Up to this point, Izquierdo had been free to walk away from the stop. He had not been handcuffed, and none of the agents had raised their voices or pulled out a weapon.

17. When Izquierdo admitted he had drugs and a firearm, the TFOs immediately arrested him. They handcuffed Izquierdo and put him in the back of an unmarked vehicle.

18. TFO Fahy, TFO Fallon, and Izquierdo drove to Sanger Street in a DEA vehicle. They left Izquierdo's BMW parked on Torresdale Avenue. Upon arrival, the TFOs removed

---

[3] TFO Fahy testified these items were "interesting" because drug dealers carry a "clean" phone, a "dirty" phone, and a third phone to connect the two. Tr. Suppress. Hr'g at 34:15, 18-19, ECF No. 44. Additionally, drug dealers use coffee grinders to mix drugs without getting powder everywhere, and they dispose of mill garbage in front of other people's homes.

[4] Izquierdo was convicted of heroin trafficking in 2015 and had previously cooperated with the government. At sentencing, Izquierdo benefited from a downward departure motion under U.S.S.G. § 5K1.1, and at the time of the events giving rise to this case, Izquierdo was still on supervised release. TFOs Fahy and Fallon were aware of this history because they ran a criminal background check when they started investigating Izquierdo.

Izquierdo's handcuffs and gave him a second consent to search form. Gov't Ex. 2, ECF No. 46-1. Izquierdo read the form, signed it, and gave the keys to the townhome to the TFOs. Again, he did not ask any questions about the form.

19. The search of 2053 Sanger Street began around 4:45 p.m. It took approximately one and a half to two hours. TFO Fallon and other DEA agents completed the search while TFO Fahy and Izquierdo waited, parked in the rear alleyway. No one else was in the rowhome at the time. While they waited, Izquierdo gave TFO Fahy "a sales pitch" about cooperating. Tr. Suppress. Hr'g at 43:18, ECF No. 44. The agents recovered heroin, fentanyl, cocaine, drug paraphernalia, and two firearms, and documented the search with photographs. Gov't Exs. 3a – 3k, ECF No. 46-1.

20. At around 7:15 p.m., the TFOs transported Izquierdo to the agency's Philadelphia Field Division located in the William J. Green Jr. Federal Building. Izquierdo, TFO Fahy, and TFO Fallon went to a small meeting room on the 10th floor. The TFOs offered Izquierdo water and presented him with an advice of rights form.

21. The form advised Izquierdo he had the right to remain silent; anything he said could be used against him in court; he had the right to talk to a lawyer before answering any questions, and to have a lawyer present during questioning; and if he could not afford a lawyer, one would be appointed. Gov't Ex. 4, ECF No. 46-1.

22. Izquierdo started reviewing this form at 7:32 p.m. TFO Fallon also read it to him and confirmed he understood it. Izquierdo did not ask any questions. He initialed "EI" next to each of the enumerated rights. Izquierdo also wrote "yes" in response to the questions "Do you understand your rights?" and "Are you willing to answer some questions?" Finally, he checked a statement indicating he had read the advice of rights, understood his rights, and

was "willing to freely and voluntarily answer questions without a lawyer present." *Id*. He signed the bottom of the form, and TFOs Fahy and Fallon printed their names and initials on the witness lines. *Id*. They completed reviewing and signing the form at 7:34 p.m.

23. After Izquierdo waived his rights, TFO Fallon asked Izquierdo questions and documented his responses. Izquierdo was not handcuffed during the interview. He never asked for a lawyer, never asked to take a break, and never asked to end the interview. Izquierdo gave DEA information regarding his drug dealing activity, including his suppliers, money pickups, the drugs he sold, how much he paid for those drugs, how much he sold those drugs for, and the area he sold drugs in. Izquierdo also provided several names and phone numbers of other dealers. *See* Gov't Ex. 5 (Investigation Interview R.), ECF No. 46-1.

24. Izquierdo's demeanor during this interview was "very casual and very cooperative. . . . [T]here was no h[eming] and hawing about giving any information or answering any questions. He was very forthcoming throughout." Tr. Suppress. Hr'g at 80:8-10, ECF No. 44.

25. At the end of the interview, TFO Fallon gave Izquierdo the interview notes. Izquierdo read the entire document and signed the bottom of each page. At the end of the document, he handwrote his answers to two questions:

> Q. We're [sic] you promised anything in exchange for this statement?
> A. [handwritten] No
> Q. We're [sic] you treated fairly and with respect today by DEA personnel?
> A. [handwritten] Yes

Gov't Ex. 5 at 6, ECF No. 46-1. Izquierdo, TFO Fallon, and TFO Fahy all signed the last page of the document. The interview concluded at 9:54 p.m.

26. Because DEA wished to use Izquierdo as a cooperator, TFOs Fahy and Fallon tried unsuccessfully to contact Izquierdo's probation officer that evening. They drove Izquierdo

back to his residence, and Izquierdo ceded his passport. They then drove him back to his BMW, exchanged phone numbers with him, and released him.

27. A few days later, Izquierdo surrendered to his probation officer. He was detained for violating his supervised release, and DEA successfully applied for his release. Izquierdo cooperated for two months, and then he fled the country for the Dominican Republic.[5]

## LEGAL STANDARDS

### A. Investigatory Stops

The Fourth Amendment guarantees the right of individuals "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

---

[5] Izquierdo's version of events differs significantly. According to Izquierdo, when the police stopped his car on January 10, 2022, he was not free to leave and the TFOs threatened to seek consent to search his car from his probation officer. Izquierdo also claims that after the car search did not reveal any drugs, TFO Fallon looked "pissed off" and "grabbed" Izquierdo and pulled him inside the police vehicle for a few minutes. Tr. Suppress. Hr'g at 99:16-17, ECF No. 44. Izquierdo contends he did not want to consent to a search of 2053 Sanger Street, but did so because he was worried about his minor children who were home alone. He claims TFOs Fahy and Fallon threatened to take his kids away. Izquierdo was also concerned about his adult son's upcoming immigration hearing, as Izquierdo had not yet shared the hearing notice with his son. Finally, Izquierdo claims TFO Fallon promised Izquierdo he would not be charged if he gave consent to search 2053 Sanger Street.

The Court does not find Izquierdo's testimony credible. First, Izquierdo's demeanor on the stand was arrogant. He did not come across as sincere or trustworthy. Second, TFOs Fahy and Fallon, who were sequestered during each other's testimony, both denied these allegations on cross-examination. *See id*. at 57:22-23 (testifying TFOs did not learn Izquierdo had children until late in the evening when he asked to go home); 60:12-13 (denying Izquierdo was ever placed in a police vehicle); 62:1-3 (denying TFO Fahy ever said anything to Izquierdo about his probation officer); 63:25-64:3 (testifying TFOs never saw Izquierdo with children during the investigation); 80:11-14, 94:19-95:4 (stating no promises or representations were made to Izquierdo). Third, Izquierdo's credibility is undermined based on other factors. For example, his concern for his children is contradicted by the fact that he left them home alone for over 24 hours and sold drugs while his eldest daughter was addicted to heroin. Moreover, although Izquierdo cooperated for two months after his arrest, he never mentioned any alleged coercion to the government before he fled to the Dominican Republic. Lastly, Izquierdo's signed statements that DEA did not threaten or force him, did not promise him anything, and treated him fairly contradict his recent claims. The Court thus rejects Izquierdo's testimony in its entirety.

A traffic stop is a "seizure" for purposes of the Fourth Amendment. *United States v. Delfin-Colina*, 464 F.3d 392, 396 (3d Cir. 2006). A police officer, however, may "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Id*. (internal quotation marks and citations omitted); *see also Terry v. Ohio*, 392 U.S. 1, 22-24 (1968). Reasonable, articulable suspicion means "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." *Terry*, 392 U.S. at 21. In determining whether reasonable, articulable suspicion exists, courts must consider the "totality of the circumstances." *Delfin-Colina*, 464 F.3d at 397. This standard is "less demanding . . . than probable cause . . . and only a minimal level of objective justification is necessary for a *Terry* stop." *Id*. at 396 (internal quotation marks and citations omitted).

## B.  Custodial Interrogation

A defendant must be warned of his right against self-incrimination and his right to an attorney before he can be subjected to custodial interrogation by law enforcement. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Custodial interrogation occurs when law enforcement questions a defendant after he "has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Rhode Island v. Innis*, 446 U.S. 291, 298 (1980) (quoting *Miranda*, 384 U.S. at 444). "[T]he ultimate inquiry is: whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Vidal*, 85 F. App'x 858, 861 (3d Cir. 2004) (internal quotation marks and citation omitted). But "the temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop . . . does not constitute *Miranda* custody." *Maryland v. Shatzer*, 559 U.S. 98, 113 (2010).

## C.  Consent

The Fourth Amendment's guarantee against unreasonable searches and seizures ordinarily requires law enforcement to obtain a probable cause warrant before conducting a search. *See United States v. Crandell*, 554 F.3d 79, 83 (3d Cir. 2009). But a warrantless search "conducted pursuant to a valid consent is constitutionally permissible." *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). Similarly, a defendant may waive his Fifth and Sixth Amendment *Miranda* rights if he does so "voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444. In either case—consent to search or consent to waive *Miranda* rights—the burden of showing consent was voluntarily given and was "not the result of duress or coercion, express or implied" lies with the government. *Schneckloth*, 412 U.S. at 248.

In determining whether consent was voluntary or coerced, courts must consider the totality of the circumstances and examine "the characteristics of the accused and the details of the interrogation." *Id*. at 249, 226. Relevant characteristics of an interrogated individual can include his age, education, intelligence, and knowledge of his constitutional rights. *Id*. at 226. Relevant characteristics of an interrogation include the length of detention, whether questioning was repeated or prolonged, and whether the individual was deprived of food or sleep or was otherwise subjected to physically taxing circumstances. *Id*.

**DISCUSSION**

Izquierdo moves to suppress evidence of the drugs and firearms seized from 2053 Sanger Street, as well as his statements to DEA. He argues (1) the stop of his car on Torresdale Avenue was unlawful, (2) he was in custody during the stop and should have received *Miranda* warnings, and (3) he was coerced into giving consent for the searches of his car and townhome and the interview. The government maintains (1) DEA had reasonable suspicion to stop Izquierdo, (2) he was not in custody until he admitted he had drugs and a gun, and (3) he voluntarily consented to

the searches and an interview. Because TFOs Fahy and Fallon had a reasonable, articulable suspicion that Izquierdo was a drug dealer, did not arrest him until he admitted to possession of drugs and a firearm, and did not coerce or threaten Izquierdo, the motion to suppress will be denied.

Izquierdo first argues the stop on Torresdale Avenue was unlawful because he had not committed a traffic infraction, DEA did not intend to arrest him for money laundering, and DEA had not observed any illegal activity. The legal standard for a *Terry* stop, however, is not observation of unlawful activity—it is "reasonable, articulable suspicion that criminal activity is afoot." *Delfin-Colina*, 464 F.3d at 396 (internal quotation marks and citations omitted). And DEA had reasonable suspicion that Izquierdo was involved in drug crimes. TFOs Fahy and Fallon knew Izquierdo had previously laundered money, which is often linked to drug crime. They also knew he went back and forth between 2053 Sanger Street, which was not his residence, and a high drug crime corner multiple times a day, where he exchanged "stuff" with drug dealers. Based on the foregoing, they suspected 2053 Sanger Street was a "stash house" for drugs or a mill. Tr. Suppress. Hr'g at 22:13-19, ECF No. 44. And on January 10, 2022, when they observed Izquierdo taking trash away from Sanger Street, they suspected he was disposing of mill trash. They also observed Izquierdo driving the same route he normally took to A and Indiana. These facts are more than enough to constitute reasonable, articulable suspicion of illegal drug activity sufficient to initiate a *Terry* stop.

Even as Izquierdo argues the stop was unlawful, he also argues because DEA had probable cause to arrest him for money laundering, he was in custody during the stop. As such, according to Izquierdo, his confession to possessing drugs and a firearm must be suppressed because DEA did not give him *Miranda* warnings prior to these admissions. It is undisputed that TFOs Fahy and Fallon had probable cause to arrest Izquierdo for money laundering when they asked the police to

pull him over. *See* Tr. Suppress. Hr'g at 49:13-16, 62:12-22, ECF No. 44. But they initiated the stop for a different purpose: to investigate reasonable suspicion of drug crime. *See id*. at 23:5-24:1. Izquierdo was not under arrest when the police initiated the stop, nor when DEA asked him to step out of his vehicle and asked for consent to search. *Id*. at 32:12-15. Because Izquierdo was not under arrest, and a *Terry* stop does not establish custody for *Miranda* purposes as a matter of law, the Court concludes Izquierdo's *Miranda* rights were not violated by the stop on Torresdale Avenue.

Finally, Izquierdo argues his consent to the searches of his BMW and 2053 Sanger Street, as well as his statements to DEA, were all a product of coercion. Because the Court does not credit Izquierdo's testimony, there is no credible evidence of coercion. In examining Izquierdo's characteristics, the Court notes he reads and understands English, had previously interacted with DEA, and signed multiple forms attesting to his consent and the lack of threats, force, or mistreatment. Izquierdo only claimed he was coerced and threatened after he was charged and extradited from the Dominican Republic. As to the surrounding circumstances on January 10, the initial stop occurred in the afternoon, in a public location, by a marked police car. Izquierdo was not under arrest when he was stopped. And while he was ultimately detained for more than six hours, DEA released Izquierdo the same day. Lastly, the Investigation Interview Record Izquierdo signed indicates questioning was not repeated or prolonged, but rather, that Izquierdo volunteered information because he wanted to cooperate with DEA. Thus, the characteristics of Izquierdo and the investigation on January 10, 2022 indicate Izquierdo voluntarily consented to the searches of his BMW and 2053 Sanger Street, and voluntarily gave a statement.

**CONCLUSIONS OF LAW**

1. The stop on Torresdale Avenue was a lawful, investigatory stop.

2. Izquierdo was not in custody until DEA arrested him for possession of drugs and a firearm.

11

3.   Izquierdo consented to searches of his BMW and 2053 Sanger Street.

4.   Izquierdo was not forced through coercion, mistreatment, threats to give his consent.

5.   Izquierdo voluntarily agreed to give statements to DEA because he was considering cooperating.

Accordingly, the motion to suppress will be denied. An appropriate Order follows.


BY THE COURT:


/s/ Juan R. Sánchez
Juan R. Sánchez, J.